| | |
|---|---|
| DONNA ANN GABRIELE CHECHELE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )  Case No. CIV-10-1286-M |
| | ) |
| TOM L. WARD, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| SANDRIDGE ENERGY, INC., | ) |
| | ) |
| Nominal Defendant. | ) |

## ORDER

Before the Court is defendant Tom L. Ward's ("Ward") Motion to Dismiss the Complaint,

filed February 15, 2011. On March 10, 2011, plaintiff filed her response, and on March 17, 2011,

defendant filed his reply. Based upon the parties' submissions, the Court makes its determination.

I.      Background

Ward is the President, CEO, and Chairman of the Board of nominal defendant SandRidge

Energy, Inc. ("SandRidge"). SandRidge is an independent natural gas and oil company focused on

exploration, development, and production activities. Plaintiff is a shareholder of SandRidge.

According to Ward, in the fall of 2008, as a result of the "global financial crisis," he was

facing unexpected economic difficulties and sought alternate short-term financing to bridge his

repayment obligations. As a result, on October 28, 2008, Ward entered into a series of agreements

to borrow approximately $75 million from two lenders ($57 million from an individual named

George Kaiser, and $18 million from Pooled CIT Investments, LLC ("CIT")) in substantially similar

transactions (the "Original Loans"). By their terms, the Original Loans were full-recourse against

Ward, carried simple interest, and matured on January 15, 2009. As an additional incentive to CIT's participation in the transactions, Ward also granted CIT a five-year warrant (the "October Warrant") entitling CIT to purchase 3,807,107 SandRidge shares from Ward. According to its terms, the October Warrant would become exercisable on the earlier of (i) the due date of the Original Loans (i.e., January 15, 2009) or (ii) the date on which Ward repaid the Original Loans in full. The exercise price under the October Warrant was equal to the lower of (i) $9.85 per share (based on a formula set forth in the loan documents) or (ii) a price dependent on the average of closing prices on the five trading days surrounding repayment of the Original Loans.

According to Ward, as the January 2009 maturity date on the Original Loans approached, it became apparent to him that he needed to refinance the Original Loans using additional SandRidge shares. As a result, on December 31, 2008, Ward and the lenders amended the Original Loans and October Warrant and entered into certain other refinancing transactions. In relation to the October Warrant, Ward and CIT amended the warrant ("December Amendment"), which had not yet been exercised, by, among other things, providing that it was immediately exercisable by CIT to purchase an increased number of shares (i.e., up to 6,672,598 shares) at the lower, fixed exercise price of $5.62 per share.

Also on December 31, 2008, Ward and Mr. Kaiser entered into certain refinancing transactions by which Mr. Kaiser's initial October 28, 2008 $57 million loan to Ward was replaced by two notes – one for $50 million and one for $8.5 million, with accelerating interest rates until the December 31, 2010 maturity date. Ward simultaneously sold Mr. Kaiser 8,896,797 shares of SandRidge stock at $5.62 per share (for a total of approximately $50 million), with Mr. Kaiser paying for the shares by provisionally reducing the balance of the $50 million note by a

corresponding amount. The stock sale agreement with Mr. Kaiser also gave Mr. Kaiser a contingent right to put the 8,896,797 SandRidge shares back to Ward at $5.62 per share until February 16, 2009 (the "Put Right"), if Mr. Kaiser was not satisfied with the results of his due diligence investigation of SandRidge (which the stock sale agreement specified Mr. Kaiser had not had the opportunity to conduct before closing). Mr. Kaiser did not exercise his conditional Put Right before it expired on February 16, 2009. Finally, on April 23, 2009, a company called TLW Properties, L.L.C., with which Ward has a relationship, sold 3,000,000 shares of common stock of SandRidge at $7.46 per share.

Plaintiff notified SandRidge by letter dated August 6, 2010 that it was entitled to recover short-swing profits from Ward. Through its outside counsel, SandRidge advised plaintiff by letter dated October 1, 2010, that the Board did not intend to file suit. Plaintiff filed her Complaint with this Court on December 1, 2010. Ward now moves to dismiss the Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

II.     Standard of Review

Regarding the standard for determining whether to dismiss a claim pursuant to Rule 12(b)(6), the United States Supreme Court has held:

> To survive a motion to dismiss, a complaint must contain sufficient
> factual matter, accepted as true, to state a claim to relief that is
> plausible on its face. A claim has facial plausibility when the
> plaintiff pleads factual content that allows the court to draw the
> reasonable inference that the defendant is liable for the misconduct
> alleged. The plausibility standard is not akin to a "probability
> requirement," but it asks for more than a sheer possibility that a
> defendant has acted unlawfully. Where a complaint pleads facts that
> are merely consistent with a defendant's liability, it stops short of the
> line between possibility and plausibility of entitlement to relief.

3

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotations and citations omitted). Further, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not shown - that the pleader is entitled to relief." *Id.* (internal quotations and citations omitted). Additionally, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* at 1949 (internal quotations and citations omitted).

Additionally, on a Rule 12(b)(6) motion, the Court may consider not only the complaint, but also documents submitted by the defendant that are referred to in the complaint, that form the basis of the plaintiff's claim, or that are in the plaintiff's possession and upon which she relied in bringing the action. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). Accordingly, the Court finds, and both parties agree, that this Court may appropriately consider the transaction documents underlying the transactions referenced in the Complaint.

III.    Discussion

Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), imposes a general rule of strict liability on beneficial owners, directors, or officers of a corporation for any profits realized from the purchase and sale, or sale and purchase, of equity and derivative securities occurring within a 6-month period. Specifically, Section 16(b) provides:

> (b) Profits from purchase and sale of security within six months
> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) or a

security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act) involving any such equity security within any period of less than six months, unless such security or security-based swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security or security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act) involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

15 U.S.C. § 78p(b). To prevail in an action under Section 16(b), a plaintiff must prove: (1) a purchase and (2) sale of non-exempt equity securities or derivative securities (3) by an insider of the issuer (4) within a less than six-month period (5) resulting in profit. *See Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998).

Ward asserts that plaintiff has identified no qualifying purchase by him and no resulting profit and that plaintiff's Complaint, therefore, must be dismissed.[1] Specifically, Ward asserts: (1) the October Warrant was not a sale of a derivative security under Section 16(b) because it did not have a fixed exercise price when it was issued; (2) even if the October Warrant could be deemed a

---

[1]Ward does not dispute that plaintiff has identified sales by him, that he is an insider of SandRidge, or that the transactions occurred within a less than six-month period.

sale of a derivative security, the December Amendment cannot be deemed a matching purchase by Ward because the substance of that amendment was not to increase Ward's interest in SandRidge stock, but rather to give CIT an ability to purchase even more shares from Ward at a more favorable (to CIT) exercise price; (3) the Put Right was not a purchase of a derivative security under Section 16(b)[2], and (4) because the transactions identified in the Complaint continually reduced his interest in SandRidge stock, he did not realize any profit.

A.    October Warrant

Ward contends that the October Warrant was not a derivative security because its exercise price was not fixed at its inception but was a floating rate of the lesser of $9.85 per share and a value contingent upon the market price at the time of the Original Loans' repayment. Plaintiff contends that the October Warrant was a "hybrid" option – an option with both a fixed and floating component – and, therefore, under the case law, a component approach should be used to determine if it was a derivative security. Plaintiff further contends that using the component approach, the October Warrant was a derivative security to the extent of its fixed-price component. Ward, however, contends that even if the October Warrant is considered a "hybrid" option, the component approach is inapplicable to hybrid option writers like Ward.

> The term derivative securities shall mean any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege at a price related to an equity security, or similar securities with a value derived from the value of an equity security, but shall not include:
>
> *          *          *

---

[2]Because the Court finds that the December Amendment was a purchase, the Court finds that for purposes of ruling on Ward's motion to dismiss, the Court need not determine whether the Put Right was also a purchase.

(6) Rights with an exercise or conversion privilege at a price that is
not fixed; . . . .

17 C.F.R. § 240.16a-1(c)(6).

The exercise price for the October Warrant was the lesser of $9.85 per share and a value

contingent upon the market price at the time of the Original Loans' repayment. *See* October Warrant

at ¶ 2, attached as Exhibit 4 to the Declaration of Robert E. Zimet. The October Warrant, thus, had

both a fixed price component and a floating price component. The Court, therefore, finds that the

October Warrant was a "hybrid" option.

Because hybrid options do not fit neatly within the rules promulgated by the Security

Exchange Commission ("SEC"), courts have wrestled with how best to determine if and when

hybrid options are derivative securities. Based upon an amicus brief the SEC provided in *Levy v.*

*Southbrook Int'l Invs., Ltd.*, 263 F.3d 10 (2d Cir. 2001), courts that have addressed this issue have

found:

> the proper way to treat hybrids under § 16(b) is as two separate
> transactions. The first transaction, the creation of the interest, is
> equivalent to fixed price options, and is always a § 16(b) event. The
> second transaction is a theoretical modification of the fixed price, but
> the *value* of this modification is measured as the difference between
> the initial fixed price and the exercise price.

*At Home Corp. v. Cox Commc'ns, Inc.*, 340 F. Supp. 2d 404, 409 (S.D.N.Y. 2004) (emphasis in

original). *See also Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*, 280 F. Supp. 2d 128, 139-140

(S.D.N.Y. 2003).

Ward asserts that this Court should not follow this case law because these cases address the

Section 16(b) issue from the point of view of the option holder, who has control over whether and

when the option is exercised, rather than the option writer, who lacks such control. Ward, however,

cites to absolutely no case law nor any other authority to support his assertion. Having reviewed the cases, the Court finds the distinction between the writer and the holder made by Ward should have no effect on the appropriate analysis to be conducted in relation to hybrid options. Nothing in the cases implies that those courts believed a hybrid option should be treated differently from the perspectives of its owner and writer; to the contrary, their language suggests that they believed a hybrid option would be a derivative security to the extent of its fixed-price component in the hands of both parties. Further, the Court finds that the distinction that Ward is attempting to make is contrary to the plain terms of the SEC's rules. The SEC's regulatory framework for derivative securities does not speak of "writers" or "owners" but speaks of "call equivalent positions" and "put equivalent position." *See* 17 C.F.R. § 240.16a-1(b), (h); 17 C.F.R. § 240.16b-6(a), (b). Further, where the SEC has made a distinction between the owner or writer of an option, it has done so expressly. *See*, *e.g.*, 17 C.F.R. § 240.16b-6(d).

Additionally, Ward asserts that applying the component analysis to hybrid option writers would run afoul of the United States Supreme Court's admonition in *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594-95 (1973), to "apply the statute only when its application would serve its goals" – namely, deterring the speculative abuse of inside information. Having carefully reviewed the parties' submissions, and the applicable case law, the Court finds that applying the component analysis to hybrid option writers does not run afoul of the Supreme Court's admonition and finds such application would serve Section 16(b)'s goal of deterring speculative abuse of inside information.

Finally, applying the component analysis to the October Warrant, the Court finds that the October Warrant was a derivative security to the extent of its fixed-price component and a non-

derivative security to the extent of its floating-price component. The fixed-price component entitled CIT to purchase 3,807,107 shares of SandRidge common stock at the fixed price of $9.85 per share. To that extent, the Court finds Ward disposed of a derivative security when he sold the October Warrant and that transaction was fully subject to Section 16(b) and the SEC's rules and regulations thereunder.

B.      December Amendment

Ward contends that even if the October Warrant could be deemed a sale of a derivative security, the December Amendment cannot be deemed a matching purchase by him because the substance of that amendment was not to increase his interest in SandRidge stock but rather to give CIT an ability to purchase even more shares from Ward at a more favorable (to CIT) exercise price.

"When the terms of an outstanding derivative security are amended, the amendment may be deemed so significant that it effectively results in the grant of a new security and a cancellation of the old security for purposes of Section 16." Peter J. Romeo & Alan L. Dye, Section 16 Deskbook at 232 (Spring 2010). Further, "[t]he exercise price of a derivative security is among the most material terms of the derivative, and . . . a discretionary amendment reducing the exercise price results in a deemed cancellation and regrant." *Id.* at 233. Because the December Amendment reduced the exercise price of the October Warrant, the Court finds that the amendment was material and, thus, resulted in a deemed cancellation of the October Warrant and a regrant of a new warrant. Further, the Court finds that said deemed cancellation of the October Warrant, which was a derivative security, by the December Amendment should be deemed a purchase of a derivative security under Section 16(b).

C.    Profit

Ward contends that because the transactions identified in the Complaint continually reduced his interest in SandRidge stock, he did not realize any profit.  Rule 16b-6(c)(2) governs the calculation of profits where, as here, transactions in a derivative security are matchable with transactions in another derivative security or transactions in the underlying security.  The rule provides that matching occurs not at the price paid for the securities but at the "price of the underlying security on the date of purchase or sale and the date of sale or purchase."  17 C.F.R. § 240.16b-6(c)(2).  In her Complaint, plaintiff sets forth the contemporaneous market prices of SandRidge's common stock at the time Ward's transactions occurred.  Because some of Ward's sale transactions occurred when these prices were higher than the prices prevailing at the time of his purchase transaction, the Court finds that plaintiff has properly pled that Ward had realized a profit under Rule 16b-6(c).

D.    Conclusion

Because the Court has found that the December Amendment was a purchase and that plaintiff has properly pled that Ward had realized a profit under Rule 16b-6(c), and because it is undisputed that plaintiff has properly pled the remaining elements of a Section 16(b) action, the Court finds that plaintiff has set forth sufficient factual matter, accepted as true, to state a claim to relief under Section 16(b) that is plausible on its face.

IV.    Conclusion

Accordingly, for the reasons set forth above, the Court DENIES Ward's Motion to Dismiss

the Complaint [docket no. 17].

**IT IS SO ORDERED this 13th day of April, 2011.**

_Vicki Miles-LaGrange_
VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE